**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| **AARON MICHAEL SHAMO,**<br><br>**Petitioner,**<br><br>**vs.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Respondent.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:23-cv-727-DAK**<br><br>Judge Dale A. Kimball |

This matter is before the Court on Petitioner Aaron Michael Shamo's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [ECF No. 17]. The court held an evidentiary hearing in connection with the motion on May 5 and 6, 2026. At the hearing, Petitioner was present and represent by Patricia Geary Glenn, and the United States was represented by Joseph Palmer and Tyler L. Muray. The court took evidence and asked the parties to submit findings of fact and conclusions of law. The court has carefully considered the evidence and arguments submitted by the parties as well as the law relevant to Petitioner's challenges to his sentence. Accordingly, the court issues this Memorandum Decision and Order on his motion.

Aaron Michael Shamo founded and led a drug trafficking organization that sold fentanyl-laced pills on the dark web. Following a jury trial, Shamo was convicted of being a principal leader of a continuing criminal enterprise ("CCE") along with other offenses. His conviction for being a principal leader of a CCE required the court to impose a mandatory sentence of life

imprisonment.[1] Shamo appealed, and the Tenth Circuit Court of Appeals affirmed. Shamo now moves under 28 U.S.C. § 2255 to vacate his convictions.

Shamo's motion raises four separate claims. Shamo claims that his defense counsel rendered ineffective assistance in advising Shamo about a plea offer that he rejected. Following discovery and an evidentiary hearing, the Court finds that Shamo's claim must be rejected because he cannot establish either deficient performance or prejudice under the *Strickland* standard. Shamo's contentions that his experienced trial counsel (1) failed to advise him that he was facing a charge with a mandatory life sentence; and (2) misled him into believing he had a strong defense against that charge are both without merit. With respect to demonstrating prejudice, Shamo's claim that, but for counsel's allegedly ineffective advice, he would have accepted the plea offer is unfounded and based on nothing more than Shamo's bare, post-hoc, self-serving assertion.

Shamo's claim of ineffective assistance at trial fares no better. Contrary to Shamo's claim, his trial counsel was not confused or tricked by the indictment's language into adopting a legally foreclosed trial strategy of proving that Shamo was not the only principal leader of the enterprise. Rather, trial counsel aimed to show that Shamo was not capable of being a principal leader of a sophisticated drug organization at all. In any event, Shamo cannot show prejudice from the allegedly ineffective strategy because his petition expressly concedes that he had no viable defense to the principal-leader element.

Third, Shamo's claim that appellate counsel rendered ineffective assistance because the prosecutorial misconduct claim that appellate counsel allegedly should have raised is without

[1] This Court noted at sentencing that if it had any discretion to give another sentence, it would have given Shamo less than a life sentence.

merit. And, finally, Shamo's challenge to the indictment's language is both waived and procedurally defaulted. And his challenge fails on the merits because the indictment provided constitutionally sufficient notice that Shamo could be convicted if he was either the only principal leader or one of several principal leaders.

## FACTS

### I. Shamo's Offense Conduct

In 2014, petitioner Aaron Shamo and his roommate Drew Crandall worked for the online marketplace eBay. *United States v. Aaron Michael Shamo*, Case No. 2:16-cr-631-DAK, Crim. Doc. 333 at 7-8. Shamo and Crandall both had prescriptions for Adderall. *Id.* at 12-13; 76. Shamo suggested that he and Crandall should sell their unused Adderall. *Id.* Shamo created an account on a dark web marketplace to sell their extra pills.[2] *Id.* at 13-14; *see United States v. Shamo*, 36 F.4th 1067, 1072 (10th Cir. 2022).

Shamo quickly grew his online drug business. *Shamo*, 36 F.4th at 1072. First, instead of selling just his own surplus pills, Shamo began buying and re-selling bulk quantities of Adderall online. *Id.* Then he started acquiring other illegal drugs, including cocaine, ecstasy, LSD, and Xanax.[3] *Id.* Shamo resold the drugs at a markup on dark web marketplaces. *Id.*; *see* Crim. Doc. 333 at 27-28, 35.

Shamo then began hiring employees to help him receive and distribute packages of drugs through the mail. *Shamo*, 36 F.4th at 1072. At first, when Shamo ordered packages of illegal drugs from overseas, he had them sent directly to his own address. Crim. Doc. 333 at 22.

---

[2] The dark web is a portion of the Internet accessible only to users who have the specific website address and specialized software, such as a program known as "TOR," that masks the location and identity of the user's computer. *See Shamo*, 36 F.4th at 1072 n.2.

[3] Xanax is the brand name for alprazolam, an anti-anxiety medication that is a federally controlled substance. *See Shamo*, 36 F.4th at 1070.

However, after authorities intercepted a package of cocaine and questioned Shamo's roommate, Shamo recruited some of his friends to serve as "drops." *Id.* at 22-25, 77. The "drops" would receive the packages in their names at their own addresses and then deliver them to Shamo. *Id.* at 23-25.

As Shamo's business grew, he used increasingly sophisticated technology to manage it. *See Shamo*, 36 F.4th at 1073. Shamo set up secure communications channels between himself, Crandall, and their drops using encrypted email systems and the Telegram app. Crim. Doc. 333 at 41-42; 70-72. Shamo created cryptocurrency wallets to receive payments from dark web customers and to pay his suppliers and employees. *Id.* at 17, 27. Shamo used a "tumbling service" to obfuscate the source of his illicit payments. *Id.* at 80.

By the spring of 2015, Shamo's drug business was shipping approximately 40 to 60 orders of illegal drugs per day. *Id.* at 34-35. Shamo was making enough money to leave his job at eBay and buy a BMW. *Id.*

Shamo determined that it would be more profitable to manufacture his own counterfeit Xanax pills. *Shamo*, 36 F.4th at 1072. He ordered a pill press machine from China and began making fake Xanax. *Id.* Shamo set up a new storefront on a dark web marketplace called AlphaBay. *Id.* at 1072-73. Shamo named his storefront "Pharma-Master." *Id.*

Shamo was the senior partner in the online drug business he founded with Crandall. He received two-thirds of the profits to Crandall's one-third. Crim Doc. 333 at 16-17; 115-19. Shamo made all the major business decisions. *Id.* He administered the accounts on AlphaBay. *Id.* He established and maintained relationships with foreign suppliers. *Id.* He controlled the finances and accounts, including the Bitcoin wallets used to receive payments to Pharma-Master.

*Id.* Crandall's primary role was handling the packaging and shipping of drugs to customers. *Id.* Crandall also helped Shamo mix ingredients and press pills. *Id.*; *see Shamo*, 36 F.4th at 1072-74.

In late 2015, Crandall's girlfriend demanded that he stop selling drugs. Crim. Doc. 333 at 39. Crandall told Shamo that he was quitting the business and moving abroad. *Id*. at 39-40, 48. Shamo agreed to buy Crandall out of his junior partnership for $40,000. Crim. Doc. 333 at 39-40. In November 2015, Crandall left for New Zealand and remained overseas until after Shamo's arrest. *Id.* at 58, 107-08.

Shamo continued expanding his drug business without Crandall. *Id.* at 43; *Shamo*, 36 F.4th at 1072-73. Shamo hired two women, Alex Tonge and Katie Bustin, to package and ship the drugs that AlphaBay users ordered from Pharma-Master. *Id.* at 43-44; *Shamo*, 36 F.4th at 1071. Shamo recruited another man, Luke Paz, to help him manufacture the counterfeit pills. *Shamo*, 36 F.4th at 1073.

Before Crandall left, Shamo only manufactured counterfeit Xanax. Crim. Doc. 333 at 74-75. But one of Shamo's customers, Chris Kenny, told Shamo he could make far more money manufacturing counterfeit oxycodone pills using fentanyl. *Shamo*, 36 F.4th at 1073-74. Shamo researched how to make counterfeit oxycodone and how to obtain fentanyl and other raw materials from China. *Id.* He then began making fentanyl pills using dies and stamps to make the pills look like prescription oxycodone. *Id.* Shamo distributed his pills to Kenny's customers and used them as human Guinea pigs to test the fentanyl's effectiveness at mimicking commercially-produced oxycodone. *Id.* After using the pills, Kenny's customers provided feedback on whether they had a similar appearance, effect, and strength as authentic oxycodone. *Id.*

Through trial and error, Shamo improved his recipe and manufacturing techniques, but it remained essentially a home-brew operation. *Id.*; *see* Crim. Doc. 333 at 49-52; Crim. Doc. 405 at 95. Shamo mixed the fentanyl and other ingredients by shaking them in mason jars. Crim Doc. 333 at 49-52. He did not have sophisticated equipment or quality control processes to ensure that his pills did not contain lethal quantities of fentanyl. *Id.*

By early 2016, Shamo's dark-web fentanyl business had evolved to become a "huge operation." *Shamo*, 36 F.4th at 1073. The mature business operated as follows: Shamo purchased and imported fentanyl illicitly from abroad. *Shamo*, 36 F.4th at 1073-74. Shamo had the fentanyl and other ingredients shipped to drops, who would then deliver the packages to Shamo. *Shamo*, 36 F.4th at 1073-74. Shamo and Paz would then manufacture counterfeit oxycodone pills using these ingredients. *Id.* While Paz helped Shamo mix the inert ingredients, Shamo maintained control over the fentanyl and how much of it would be added to each batch. *Shamo*, 36 F.4th at 1074.

Shamo marketed the fake oxycodone on the Pharma-Master storefront on AlphaBay. *Id.* Some of Shamo's customers were individual users who ordered small quantities for personal use, while others were major drug dealers buying in bulk. *Id.*; Crim. Doc. 333 at 191. Shamo forwarded customers' orders to Tonge and Bustin through encrypted email. *Shamo*, 36 F.4th at 1073-74. Tonge and Bustin prepared the pills for shipping. *Id.* They packaged the pills in Mylar bags, added fake return addresses, and included invoices falsely indicating that the packages contained coffee or other legitimate products. Crim. Doc. 387 at 161-62. A runner, Sean Gygi, picked up the packages from Tonge and Bustin's house and dropped them at widely dispersed post offices and mailboxes. *Shamo*, 36 F.4th at 1071, 1073.

As Shamo's sales on AlphaBay grew, he needed help responding to customers who submitted special requests or complaints. *Id.* at 1073. He recruited an assistant, Mario Noble, to respond to routine complaints and escalate major problems to Shamo. *Id.* Later, in the summer of 2016, he enticed Crandall (who was running out of money in New Zealand) back into the business and paid him $600 a week provide additional help with customer service. Crim. Doc. 333 at 65-75.

Between December 2015 and November 2016, Shamo sold at least 458,946 fentanyl pills in 3,491 separate transactions. Crim. Doc. 395 at 128. These sales generated more than $2.4 million in revenue from fentanyl alone. *Id.* at 129. Shamo's overall sales during that period (including counterfeit Xanax and other, non-fentanyl pills) included at least 872,659 pills, in 5,589 transactions, for a total of $2,817,520.93. *Id*. at 128.

Many of Shamo's customers died from drug overdoses. Crim. Doc. 212 at 3. Investigators identified more than eighty such customers. *Id.* For example, on March 3, April 6, and August 3, 2016, Shamo delivered fentanyl-laced pills to three different customers (identified as "C.V.," "E.B.," and "G.K."), all of whom died of drug overdoses with fentanyl in their systems within three weeks of ordering drugs from Shamo. Crim Doc. 136 at 12; 212 at 3-4. Another customer, R.K., received fentanyl-laced fake oxycodone pills from Shamo on June 11, 2016, crushed and snorted two of those pills on June 12, and was found dead the next morning with alcohol, a cocaine-cutting agent, and fentanyl in his blood. Crim Doc. 213 at 2, 5; *see* Crim Doc. 389 at 24.

## II. Investigation and Arrest

In late 2016, U.S. Customs and Border Protection agents screening international mail found a package from China containing fentanyl. *Shamo*, 36 F.4th at 1070. The package was

addressed to one of Shamo's drops, Ryan Jensen. *Id.* Law enforcement agents confronted Jensen, who confessed that Shamo had hired him to receive packages from China. *Id.* Later that month, authorities seized another suspicious package containing alprazolam addressed to Sean Gygi. *Id.* at 1070-71. Gygi told law enforcement agents that Shamo was paying him to pick up packages from Tonge and Bustin's house and drop them in various mail collection boxes. *Id.* at 1071. For a few days, he picked up packages from Tonge and Bustin's house as usual, but then he gave them to the agents. *Id.* The packages were full of counterfeit Xanax and oxycodone pills. *Id.*

On November 22, 2016, agents executed a search warrant at Shamo's house. *Shamo*, 36 F.4th at 1071. They found four pill presses, one of which was still churning out fake Xanax tablets. *Id.*; *see* Crim. Doc. 384 at 807. The agents also found fentanyl powder, counterfeit oxycodone and Xanax pills, and more than $1.2 million in cash. *Shamo*, 36 F.4th at 1071. Shamo's parents later turned in an additional $429,000 in cash that Shamo had left with them. *Id.* Shamo also had Bitcoin holdings that were worth several million dollars. *Id.* at 1074; *see* Crim. Doc. Crim. Doc. 332 at 5.

## III. Pre-Trial Proceedings

### A. Charges

On December 7, 2016, a federal grand jury charged Shamo with possessing fentanyl with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Crim Doc. 11. On May 31, 2017, the grand jury issued a superseding indictment charging Shamo and codefendants Crandall, Tonge, Bustin, Noble, and Gygi with several additional counts. Crim Doc. 32. Most significantly, the superseding indictment charged Shamo with engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848. *Id.* at 2-8. A defendant engages in a CCE if

he commits a "continuing series" of felony controlled-substance offenses "in concert with five or more other persons"; serves as an "organizer," "supervisor[]," or "manage[r]" of the enterprise; and "obtains substantial income or resources" from the enterprise. 21 U.S.C. § 848(c). Section 848 also provides a mandatory punishment of life imprisonment if

> (1) [the defendant] is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
>
> (2)(A) the violation referred to in subsection (c)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title.

21 U.S.C. § 848(b).

As applicable here, Section 848(b)'s "leader enhancement" establishes a mandatory life sentence for a principal administrator, organizer, or leader of a CCE who commits an underlying felony drug offense involving at least 12 kilograms of fentanyl. *See id.*; 21 U.S.C. § 841(b)(1)(B)(vi) (criminalizing possession of more than 40 grams of fentanyl). The superseding indictment charged Shamo with the leader enhancement, alleging that he "was a principal administrator, organizer, supervisor and leader of the criminal enterprise, which involved possession with intent to distribute and distribution of more than 12,000 grams of [fentanyl]." Crim Doc. 32 at 8. Under the superseding indictment, then, Shamo faced a mandatory life sentence if the jury found that he was a principal administrator, organizer, or leader of a CCE involving 12 kilograms of fentanyl. *Id.*; *see* 21 U.S.C. § 848(b).

A year-and-a-half later, on October 18, 2018, the grand jury returned a second superseding indictment charging Shamo with 13 counts. Crim. Doc. 136. The second superseding indictment realleged the CCE count and the leader enhancement. Crim Doc. 136 at 12. In addition, the second superseding indictment included a new count alleging that Shamo

distributed fentanyl resulting in the death of one of his customers. *Id.* at 15. That charge carried a potential life sentence and a mandatory minimum sentence of 20 years. *See* 21 U.S.C. § 841(b)(1)(C).

**B. Defense Counsel**

Shamo was initially represented by Adam Bridge of the Federal Public Defender's office. Doc. 100 (Evidentiary Hearing Transcript, May 5, 2026) ("Tr. Vol. I") at 11. Around May 2017, shortly before the first superseding indictment was returned, Shamo retained the law firm of Skordas, Carston & Hyde. *Id.* at 12-13. The attorneys who represented Shamo from that point through his trial included Greg Skordas, Rebecca Skordas (who left the case in late 2017), Kaytlin Beckett, and Daryl Sam (who joined the defense team in September 2018). *See* Doc. 19-1 (Skordas Decl.) at 2; Doc. 19-2 (Sam Decl.) at 1.

At the time Shamo retained him, Greg Skordas had practiced criminal law for more than 30 years. *See* Doc. 19-1 (Skordas Decl.) at 1; Tr. Vol. I at 158-59. He had tried hundreds of cases as both a defense attorney and a prosecutor. *Id.* Rebecca Skordas was also an experienced criminal defense attorney who had negotiated hundreds of pleas in federal criminal cases. Tr. Vol. I at 13-14, 48. She had previously handled CCE cases and other cases involving mandatory life sentences. *Id.* at 13.

**C. Shamo's counsel advised him of the CCE charge and mandatory life sentence**

After Shamo was charged in the first superseding indictment with being a principal leader of a CCE in May 2017, Rebecca Skordas met with him to review the charges. Tr. Vol. I at 49. She explained what the government would have to prove to convict him under the leader enhancement. *Id.* She did not suggest that the government would have to prove that he was the *only* principal leader, or that it would be a valid defense if there were other principal leaders

besides himself. *Id.* at 49-50. She specifically advised Shamo that he would receive a mandatory minimum life sentence if he were convicted. *Id.* at 49. She explained these points multiple times, in terms that a child would understand, to ensure that Shamo was fully aware of the mandatory nature of the life sentence that he was facing. *Id.* Shamo understood her explanation. *Id.* On multiple occasions after the initial explanation from Rebecca Skordas, Shamo's other attorneys, including Greg Skordas and Darryl Sam, repeatedly reviewed the key charges against Shamo and advised him that he would receive a mandatory life sentence if he were convicted on the CCE leader count. *See id.* at 129, 145, 152.

**D. Plea Negotiations**

Shamo's counsel worked to obtain a favorable plea offer from the government. Tr. Vol. I at 9-10, 16-19. Rebecca Skordas decided to focus on Shamo's relative lack of culpability, especially compared to other codefendants, to convince the government that, under the sentencing factors in 18 U.S.C. § 3553(a), a sentence of less than life imprisonment would be appropriate. *See* Tr. Vol. I at 15-21, 29-30. She understood that showing that other defendants were equally culpable in managing the drug conspiracy was not a legal defense to the CCE leader enhancement, but she believed, based on her long experience, that this was the best strategy to persuade the government to offer something less than a mandatory life sentence. *Id.* at 22-25, 29, 51. During her time on the case, Rebecca Skordas had informal discussions with prosecutors about a potential proffer meeting and plea agreement, but those discussions did not result in a formal plea offer. *Id.*

*1. Potential defense to misbranding*

As part of the strategy of mitigating Shamo's perceived culpability, Shamo's defense team considered hiring computer experts to search for evidence indicating that Shamo had

disclosed to his dark web customers that they were buying fentanyl pills rather than genuine OxyContin. Tr. Vol. I at 31-34. Shamo's team hoped that this might mitigate his culpability because, in the government's view, the most aggravating factor in the case was Shamo's decision to market home-brew pills with lethal quantities of fentanyl as if they were commercially produced Oxycontin. *Id.* The government believed that Shamo's misbranding caused dozens of unsuspecting buyers to die of overdoses while Shamo reaped huge profits. *Id.*; *see* Exh. 2 (R. Skordas Resp to Interrogatories) at 6. When Rebecca Skordas proposed hiring the experts to Shamo's parents, she explained that the computer analysis might provide a "complete defense" to the drug adulteration charges and could also be helpful in plea negotiations, but she did not suggest that the analysis would support a legal defense to the CCE charge. Tr. Vol. I at 36-37; Exh 3, 4 (R. Skordas emails).

*2. The Bitcoin Sale*

In late 2017, the government suggested to Shamo's counsel that the parties file a joint motion to authorize an interlocutory sale of cryptocurrency that the government had seized as property derived from Shamo's drug trafficking. *See* Tr. Vol. I at 38-39; Crim Doc. 87. The motion did not address the merits of whether the cryptocurrency would ultimately be forfeited; its purpose was simply to lock in a stable value for the cryptocurrency while forfeiture proceedings were pending. *Id.* Shamo's counsel agreed to the motion. Although the government did not offer any reduction in sentence or other concrete concession in exchange, Shamo's counsel believed that this cooperative gesture might lead to more favorable negotiations in a potential proffer session. Tr. Vol. I at 38-40. And, according to counsel, agreeing to the sale would not affect Shamo's interests because the cryptocurrency would inevitably be forfeited

regardless of when it was sold. *Id.* Rebecca Skordas explained all of this "very clearly" to Shamo in a one-on-one meeting. *Id.* at 40. Shamo consented to the sale. *Id.* at 138.

*3. The Plea Offer*

After Rebecca Skordas left the case near the end of 2017, Shamo's defense team continued working to obtain a plea offer from the government. Tr. Vol. I at 138. In November 2018, Shamo's attorneys met with government counsel, including the United States Attorney, and explained their view that, because Shamo's culpability was similar to his codefendants', he should be given an opportunity to plead guilty to charges carrying less than a mandatory life sentence. *Id.* at 118, 138-39.

Following that meeting, the United States Attorney called Greg Skordas and extended a plea offer. Tr. Vol. I at 118, 141-42, Crim Doc. 218 at 2. The offer was an agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), in which the agreed upon sentence would be a range from 40 years to life imprisonment. Tr. Vol. I at 119, 121, 129-30, 159; Doc. 17-3 (Exh. C); Crim Doc. 400 at 18-20.

Shortly after that phone call, Darryl Sam met in person with Shamo for approximately two hours and conveyed the plea offer. Tr. Vol. I at 120. He explained the offer's terms, and he also reviewed the witnesses and evidence that the government would likely present at trial. *Id.* at 130. Shamo immediately and emphatically rejected the offer. *Id.* Shamo indicated that he "really wanted to go to trial," and that he was looking forward to the "opportunity to testify and give his side of the story." *Id.*

Greg Skordas also discussed the plea offer with Shamo on multiple occasions, both in person and on the phone. Tr. Vol. I at 142-44. Greg Skordas told Shamo that it was not a "great offer," and that it was unfair that Shamo would receive a significantly higher sentence than his

codefendants. Tr. Vol. I at 144, 160; Doc. 19-1 (Skordas Decl.) at 2-4. But Greg Skordas also made sure that Shamo understood that, if he refused the offer, he would likely face a mandatory life sentence. Tr. Vol. I at 144-45 ("I told him that the alternative was that he'd spend the rest of his life in prison. I thought it was important that he know that."); *see id.* at 152 ("I told him he would never get out of prison absent some gift from the president of the United States.").

Shamo again rejected the offer out of hand. He did not believe that a 40-year offer was worth considering. *Id.* at 145-46, 160. He did not even want to discuss it. *Id.* Shamo told Greg Skordas that a 40-year sentence was essentially the same as a life sentence, so he had nothing to lose by going to trial. *Id.* at 147-48, 160. Shamo also believed, based on advice from other inmates, that he would not actually serve a life sentence because his sentence would eventually be commuted. *Id.* at 147-48. Shamo wanted "nothing to do with" the 40-year offer, and neither Greg Skordas nor anyone else could have persuaded him to accept it. *Id.* at 145-46.

After Shamo rejected the government's offer of 40 years to life, his defense team decided to make a counteroffer of 25 years to life. *Id.* at 122-25. Shamo initially wanted to offer 15 years, but his counsel believed that 25 years was more realistic. *Id.* at 71. On February 5, 2019, Shamo's counsel sent a letter to the United States Attorney containing their 25-year counteroffer, which, the letter argued, would allow Shamo's counsel "the opportunity to argue for a sentence more in line with the high end of what the co-conspirators may be receiving." Exh. 12 at 1; Tr. Vol. I at 122-25. The government rejected Shamo's counteroffer.

The government's 40-year offer remained open for approximately six months, expiring on May 29, 2019. *See* Crim Doc. 218 at 2; Crim. Doc. 400 at 18-20. On that date, the district court held a colloquy with Shamo about the plea offer. Crim. Doc. 400 at 18-20. Before the hearing, Shamo confirmed with his counsel that he still wanted to reject the offer. The

prosecutor stated on the record that the offer would expire that day. *Id.* Shamo confirmed that he had received the offer six months before, had discussed it with his attorneys, and believed that he had sound reasons for rejecting it. *Id.*

**IV. Shamo's Conviction at Trial**

Shamo's trial began in August 2019. In his opening statement, Greg Skordas conceded that the evidence would establish Shamo's guilt of "many" of the counts against him. Crim. Doc. 387 at 44. However, he argued that Shamo had not caused the death of any individual and that he was not "a leader," "a mastermind," or "the kingpin" of the organization. *Id.* at 45. He argued that Shamo had severe attention deficit disorder that made him incapable of creating and managing a sophisticated drug trafficking organization, and that it was Crandall and Paz, not Shamo, who played the key roles in organizing and running the business. *Id.* at 50-53.

The government's case included testimony from several of Shamo's subordinates in his drug business, including Crandall, Paz, Noble, Gygi, Tonge, Bustin, and Jensen. *See Shamo*, 36 F.4th at 1072-73. All testified that Shamo was the organization's leader. *Id.*; *see, e.g.*, Crim. Doc. 387 at 118. According to their testimony, it was Shamo who founded the business, set up and controlled the dark web accounts, made the important decisions, recruited and trained the employees, and kept most of the profits. *Shamo*, 36 F.4th at 1072-73. The government also introduced physical evidence, including the pill presses, drugs, cash, and shipping materials that the government had seized from Shamo and his employees. *Id.* at 1072. There was also electronic evidence, including the drug transaction records from the Pharma-Master storefront on AlphaBay and records of Shamo's financial accounts and cryptocurrency wallets. *Id.* at 1072-73.

Shamo testified as part of the defense case. *Id.* at 1073-74. Shamo admitted his involvement in the drug trafficking operation, but he minimized his own role. *Id.* Shamo

claimed that Crandall, Paz, Noble, and Chris Kenny had played the key roles in creating and expanding the drug business. *Id.* Shamo admitted, however, that he approved the plan to manufacture and sell fentanyl-laced pills, ordered the ingredients, experimented with the fentanyl recipe, and received most of the revenue, including the $1.2 million found in his house. *Id.*

The jury convicted Shamo on 12 counts, including the CCE charge, but it was unable to reach a verdict on the death-resulting count. *Shamo*, 36 F.4th at 1074. The district court, as required under Section 848(b), imposed a sentence of life imprisonment. *Id.*

**V. Post-Trial Proceedings**

On direct appeal, the Tenth Circuit affirmed Shamo's convictions and sentence. *Shamo*, 36 F.4th at 1074.

Shamo then filed the instant motion to vacate his convictions and sentence under 28 U.S.C. § 2255. Doc. 1; 17 (Amended motion). Shamo's motion argued principally that the indictment failed to properly charge the "principal leader" element because it alleged that he was "*a* principal . . . leader" while the statutory enhancement applies if he was either "*the* principal . . . leader" or if he was "one of several" such leaders. In Shamo's view, the indictment's language means that he was *the only* principal leader, and the indictment therefore failed to provide notice that he could also be convicted as one of several such leaders. Shamo further claimed that the indictment misled Shamo's trial counsel to believe that Shamo would be acquitted if he could show that anyone else in the enterprise was also a principal leader. That erroneous belief, according to Shamo, led trial counsel to misadvise Shamo regarding the risks of rejecting the plea offer and to adopt a legally untenable defense at trial. Shamo also argued that his appellate counsel was ineffective.

Shamo moved for discovery to support his claims. This Court noted that Shamo's challenge to the indictment was likely meritless, *see* Doc. 12 at 3, but it authorized discovery related to Shamo's claim of ineffective assistance at the plea stage. Doc. 29. Following a lengthy discovery process, the Court held a two-day evidentiary hearing at which five of Shamo's counsel testified—namely, Adam Bridge, Rebecca Skordas, Kaytlin Beckett, Daryl Sam, and Greg Skordas—as well as Shamo himself.

## DISCUSSION

### I. Counsel's Performance At the Plea Stage

Shamo contends that he was denied effective assistance of counsel at the plea stage because his trial attorneys misadvised him in his decision to reject the plea offer. Shamo does not dispute that his counsel conveyed the offer to him, discussed it with him on multiple occasions, and made clear that the ultimate decision whether to accept it was his. Rather, Shamo argues that counsels' performance was constitutionally deficient because they (1) failed to explain that he would receive a *mandatory* life sentence if he were convicted under the CCE leader count; and (2) misadvised him that he would be acquitted of that count if he could show that he was not the only leader of the organization. Shamo further asserts that, but for his lawyers' bad advice, he would have accepted the 40-year plea offer. *See* Doc. 17 (Amended Section 2255 Motion) at 24-28; Doc. 17-1 (Shamo Decl.) at 6-9.

As explained below, Shamo fails to establish either deficient performance or prejudice. On performance, the record establishes that Shamo's experienced counsel provided constitutionally sufficient advice. Shamo's counsel clearly and repeatedly explained the CCE count and its mandatory life sentence. And Shamo's counsel never told him that he could defeat that charge by showing that other people were equally responsible for the drug trafficking

organization. When the plea offer came, Shamo's counsel conveyed the offer to him, discussed its terms on multiple occasions, and candidly presented the risks of rejecting it.

With regard to prejudice, Shamo fails to show that he would have accepted the plea offer. The record shows that Shamo immediately and adamantly refused the offer, and that he would have done so regardless of his attorneys' advice. Shamo believed that a 40-year sentence was essentially a life sentence, so there was no reason to even consider the offer. He also believed, based on conversations with other inmates, that any life sentence would likely be commuted in the future. In the face of contrary testimony by his attorneys, there is no reason to credit Shamo's unsupported and self-serving assertion that he would have accepted the offer.

### A. The *Strickland* Standard

The Sixth Amendment right to effective assistance of counsel "extends to the plea bargaining process." *United States v. Watson*, 766 F.3d 1219, 1225 (10th Cir. 2014) (quoting *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)). "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test" set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Missouri v. Frye*, 566 U.S. 134, 140 (2012). Under *Strickland*, a defendant must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

To establish deficient performance, a defendant must show "that counsel's representation fell below an objective standard of reasonableness" that was outside "the wide range of reasonable professional assistance." *Id.* at 687-89. *Strickland* emphasized "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" and that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at

690. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. *Strickland*'s standard is a "deferential" one, and, to surmount its "high bar," the challenger bears the burden of showing "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104-05 (2011) (internal citations and quotation marks omitted).

"To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler*, 566 U.S. at 163 (quoting *Strickland*, 466 U.S. at 694). "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id.* Where, as here, a defendant has rejected a plea offer and gone to trial, a showing of prejudice requires that the defendant establish that, but for the ineffective advice of counsel, (1) the defendant "would have accepted the plea"; (2) "the prosecution would not have withdrawn it in light of intervening circumstances" (3) "the court would have accepted its terms"; and (4) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 164.

Courts must scrutinize a defendant's assertion of prejudice in light of his "after-the-fact knowledge that he would have been significantly better off if he had taken the plea bargain." *United States v. Kearn*, 90 F.4th 1301, 1310 (10th Cir. 2024). Accordingly, courts should "remain suspicious of bald, post hoc and unsupported statements that a defendant would have changed his plea absent counsel's errors." *Id.* (quoting *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013)). A defendant's "mere allegation" that he would have pleaded guilty "but for

his counsel's errors, although necessary, is ultimately insufficient to entitle him to relief." *Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001); *see also Watson*, 766 F.3d at 1226 (explaining that defendants need something more than a "self-serving statement" to establish prejudice). As the Second Circuit explained, "in most circumstances a convicted felon's self-serving testimony is not likely to be credible." *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003). The "failure to point to any evidence in support of prejudice" beyond a self-serving post-hoc assertion "provides a sufficient basis, standing alone, to reject [an] ineffective-assistance claim." *Watson*, 766 F.3d at 1227. The defendant must point to "contemporaneous evidence" from the factual circumstances surrounding the plea-bargaining process to support his post hoc claim that he would have accepted the plea offer. *Dominguez*, 998 F.3d at 1112.

**B. Constitutionally Sufficient Advice**

In this case, there is no dispute that Shamo's counsel communicated the government's plea offer and discussed it with him on multiple occasions. *See* Tr. Vol. I at 120, 130, 142-44; Tr. Vol. II at 201-02. Shamo also does not dispute that he immediately and unequivocally rejected the offer, and that he considered it to be so far off the mark that it wasn't even worth discussing. Tr. Vol. I at 130, 145-46, 151, 160; Tr. Vol. II at 201. The only issue, therefore, is whether the advice Shamo received from his counsel was so constitutionally deficient and that it led him to emphatically reject an offer that he would have accepted with competent advice.

*1. Shamo's counsel properly advised him regarding the mandatory life sentence*

First, Shamo argues that his adamant rejection of the plea offer was caused by his attorneys' failure at the outset to explain the mandatory life sentence he would receive if he were convicted under the CCE leader count. *See* Doc. 17-1 (Shamo Decl.) at 8-9; Tr. Vol. II at 199-201. However, Rebecca Skordas testified credibly that, consistent with her usual practice, she

explained the mandatory minimum life sentence to Shamo in multiple different ways in terms that a child would understand. Tr. Vol. I at 49-50. Shamo's other counsel also advised him that he was facing a mandatory life sentence, and Shamo indicated he understood what that meant. Tr. Vol. I at 128-29, 145, 152. The record is clear that Shamo's counsel competently and repeatedly explained to him that he was facing a mandatory life sentence if he were convicted.

To the extent that Shamo was misled about the mandatory minimum life sentence, his misunderstanding came from advice he received from other inmates. *See* Doc. 17-1 (Shamo Decl.) at 6 (Shamo acknowledging that other inmates, from whom he "got most of [his] advice," together with his own online research, convinced him that the judge "maintained wiggle room" to depart downward); Tr. Vol. II at 200-01 ("I didn't know there was a mandatory" because "I'm listening to people around me . . . so I thought there was wiggle room."); *see also* Tr. Vol. I at 101-02 (Shamo counsel focused on countering "a lot of incorrect information that he was receiving from jailhouse lawyers"); *id.* at 147 ("He got a lot of his legal advice from inmates at the jail."). Thus, although Shamo received competent advice from his very experienced attorneys, he chose to disregard it in favor of contrary counsel from other inmates and the internet. Shamo cannot blame his lawyers for his decision to take faulty counsel from other inmates instead of his own expert attorneys. Shamo's acknowledgment that his misunderstandings came from "listening to people around me" forecloses his claim because Shamo cannot establish a Sixth Amendment violation based on bad advice from jailhouse lawyers.

2. *Shamo's counsel properly advised him about defenses to the CCE count*

Shamo asserts that his counsel erroneously advised him that the CCE count required proof that Shamo was the *only* leader of the enterprise. That advice misled Shamo into believing

that he could be acquitted on that count by showing that Crandall and Paz were equally responsible for their fentanyl-dealing enterprise. Shamo's belief that he had a strong defense to the leader count, in turn, led him to overestimate his chances of success at trial and to undervalue the 40-year plea offer.

To support these assertions, Shamo alleges that his counsel were themselves unaware that multiple individuals could be convicted as principal leaders of a CCE, even though that possibility is explicitly set forth in the statute. *See* Doc. 17 at 23-25; 18 U.S.C. § 848(b). But Shamo provides no reason to believe that his experienced trial counsel misunderstood the essential element of a count carrying a mandatory life sentence, which constituted one of only two key disputed issues at trial. *See Shamo*, 36 F.4th at 1072. Shamo simply assumes that trial counsel must have adopted the same implausible interpretation of the indictment that Shamo advances here (*See* Part IV below), and that none of his counsel ever conducted "a quick read of the CCE statute" that would have disabused them of this error. Doc. 17 at 25-26. But *Strickland* does not permit Shamo to establish ineffective assistance by simply presuming that his counsel misread the indictment and failed to consult the statute of conviction. In fact, the presumption runs the other way. *See Strickland*, 466 U.S. at 690 (emphasizing "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment").

Moreover, the record confirms that Shamo's counsel were fully aware that he could be convicted if he were "one of several" principal leaders of the enterprise. *See, e.g.*, Tr. Vol. I at 49-51, 91-92, 126. The record also shows that counsel communicated that fact to Shamo. *See* Tr. Vol. I at 91-92. It is true that the focus of the plea negotiation strategy was to argue that Shamo shared equal culpability with codefendants Crandall and Paz and that his ultimate

sentence should be commensurate with theirs. But this was presented as a matter of fairness and proper application of the Section 3553(a) sentencing factors, not as a legal defense to the charges. Tr. Vol. I at 22-30. Shamo's counsel did not tell him he would have a valid legal defense at trial if he could show that he shared leadership responsibilities with others. Tr. Vol. I at 49-50. To the contrary, counsel candidly informed Shamo that he was likely to be convicted and that the probable alternative to accepting the plea offer was that he would spend the rest of his life in prison. Tr. Vol. I at 87, 104, 144-45.

Shamo also suggests that he rejected the offer because his counsel misled him into believing that, if he waited, the government would improve the offer. *See* Tr. Vol. II at 187. It is true that Shamo's counsel criticized the 40-year offer as unfair, they believed that their 25-year counteroffer was reasonable, and they expressed hope that the government would be open to it. *See, e.g.*, Tr. Vol. I at 65-66, 102-03, 144-45, 160. But after the government rejected the counteroffer, counsel did not advise Shamo that he could expect a better offer than the 40-year offer that remained on the table. To the contrary, Shamo's counsel expressly advised him that he was not going to get a better deal. Tr. Vol. I at 146. Moreover, even after the government rejected Shamo's counteroffer and told Shamo that the 40-year offer would expire (thereby removing any reasonable prospect of a better offer to come), Shamo persisted in his decision to reject it.

Shamo also contends that his counsel failed to explain to him the binding nature of the government's plea offer pursuant to Rule 11(c)(1)(C). Specifically, under the plea offer and Rule 11(c), if the court accepted the plea, it would have been bound to sentence Shamo to the agreed-upon sentencing range of from 40 years to life imprisonment. Contrary to Shamo's contention, his counsel specifically explained that aspect of the offer. Tr. Vol. I at 129-30. But

even assuming counsel failed to explain the mechanics of a Rule 11(c)(1)(C) plea, it would have made no difference to Shamo's decision to reject the offer. In this case, because the top end of the binding range was also the maximum possible punishment (life imprisonment), the binding nature of the plea served only to limit the court's discretion to go *below* the 40-year minimum, and Shamo made clear that he thought a 40-year sentence was essentially the same as a life sentence. Thus, the binding nature of the plea agreement could only make the offer worse from Shamo's perspective, and therefore any failure to explain that feature would not have induced him to reject it.

For that reason, this case is distinguishable from *Kearn*. In that case, the Tenth Circuit held that counsel's failure to explain the binding nature of a Rule 11(c)(1)(C) offer understated the agreement's benefits by not informing the defendant that, if the court accepted the plea, his sentencing exposure was capped at 10 years, versus a 30-year exposure if he went to trial. *See Kearn*, 90 F.4th at 1305, 1307. Here, by contrast, although pleading guilty may have made it more likely that the court would sentence Shamo below the statutory maximum sentence of life imprisonment, the plea offer did not *bind* the court to do so. Accordingly, any failure to explain the binding nature of a Rule 11(c)(1)(C) plea offer would have made no difference here.

In sum, Shamo's experienced attorneys understood, and explained to their client, that he was in serious trouble. Shamo's counsel recognized that he was charged with an offense carrying a mandatory life sentence and that the government believed he was responsible for causing the deaths of dozens of people. Shamo's counsel worked diligently to show that Shamo was equally culpable as his codefendants, not as a legal defense but as a basis to obtain a plea offer with a sentence less than life. *See* Tr. Vol. I at 49-50. They ultimately obtained such an

offer, which was a considerable achievement given the government's view of Shamo's conduct and the strength of its case.

Counsel promptly conveyed the offer to Shamo, discussed it with him on multiple occasions, and reasonably advised him that, although the offer was in their view frustratingly unfair, the alternative to accepting it was that Shamo would probably spend his life in prison. *See* Tr. Vol. I at 145. Counsels' performance in these difficult circumstances was well within the "the wide range of reasonable professional assistance" that the Sixth Amendment guarantees. *Strickland*, 466 U.S. at 687-89.

### C. Prejudice

Shamo fails to meet his burden of demonstrating that he would have accepted the plea offer. Shamo offers no evidence, other than his bare, unsupported, post-hoc assertion, that, but for counsel's allegedly deficient advice, he would have accepted the plea offer. The Tenth Circuit has made clear that such inherently unreliable testimony, on its own, is insufficient. *See Miller*, 262 F.3d at 1072 (noting that a defendant's "mere allegation" that he would have pleaded guilty is "necessary" but "ultimately insufficient to entitle him to relief"); *Watson*, 766 F.3d at 1226 (explaining that a defendant must provide something more than a "self-serving statement" to establish prejudice); *Heard*, 728 F.3d at 1183 (noting that courts should "remain suspicious of bald, post hoc and unsupported statements that a defendant would have changed his plea absent counsel's errors").

Shamo must point to "contemporaneous evidence" from the factual circumstances surrounding the plea-bargaining process to support his post hoc claim that he would have accepted the offer. *Dominguez*, 998 F.3d at 1112. He has not done so. This is not a case where the defendant carefully weighed an offer's terms and closely relied on legal analysis of his

strategic situation in rejecting it. To the contrary, Shamo rejected the offer without a moment's hesitation. Tr. Vol. I at 130, 145; Tr. Vol. II at 201. Shamo rejected the offer out of hand because, to him, there was no meaningful difference between 40 years and life. *See* Tr. Vol. I at 144. And Shamo was confident that, through commutation or some other mechanism, he would be released before serving 40 years anyway. Tr. Vol. I at 147-48; *see id.* at 148 ("[T]o [Shamo], 45, or 40, or life was all the same" because "[h]e was going to get out some day," and "those numbers didn't make a difference"); *id.* at 160 (Shamo was "adamant that there was no way that he was going to serve 40 years no matter what the offer was, and he wasn't worried about doing a life sentence").

Given Shamo's indifference between 40 years and life, he thought there was no point in even discussing the offer, and he told his lawyers he did not even want to talk about it. Indeed, Shamo admitted at the hearing that, at the time, a 40-year sentence "definitely seemed similar" to a life term, and therefore the offer "wasn't really worth discussing." Tr. Vol. I at 202. In these circumstances, nothing Shamo's lawyers said would have induced him to accept the offer. *See* Tr. Vol. I at 146 (Greg Skordas explaining that Shamo "wasn't going to be talked into it by me or anyone else."); *id.* at 100 (Shamo had "unrealistic expectations, regardless of anything that was communicated to [him]"). In the absence of any "contemporaneous evidence to substantiate a defendant's expressed preferences," the Court must reject "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). Accordingly, Shamo's "failure to point to any evidence in support of prejudice" beyond a self-serving post-hoc assertion "provides a sufficient basis, standing alone, to reject [his] ineffective-assistance claim." *Watson*, 766 F.3d at 1227.

Shamo's post-hoc assertion is particularly insubstantial in this case because his declaration and testimony conflicts in important respects with consistent testimony by his attorneys and with the trial record. For example, Shamo asserted that his attorneys never explained to him that he was facing a mandatory life sentence. *See* Doc. 17-1 (Shamo Decl.) at 6 ("my attorneys did not use the term 'mandatory'"); Tr. Vol. II at 199-200 ("Mandatory wasn't something that they brought up . . . I didn't know there was a mandatory."). But Shamo's counsel specifically advised him about the mandatory life sentence, and Shamo understood that advice. Tr. Vol. I at 49-50, 128-29, 145, 152. In addition, Shamo asserted that he was neither consulted about nor consented to the interlocutory bitcoin sale. *See* Doc. 17-1 (Shamo Decl.) at 2. But Rebecca Skordas explained "very clearly" to Shamo the reasons for agreeing to the sale, and he consented to it. Tr. Vol. I at 40, 138. Shamo also claimed he was unaware that the 40-year offer would expire, Tr. Vol. II at 203-04. However, at the hearing in which this Court discussed the offer with Shamo, the prosecutor stated clearly that the offer would expire that day. Crim. Doc. 400 at 18-20.

Even now, Shamo's asserted desire to accept a plea is not entirely unequivocal. At the hearing, when asked whether as part of a plea deal he would be willing to admit guilt on the death-resulting charge, his answer was, "I don't know." Tr. Vol. II at 205. That tentative response undermines his claim that he would have accepted the government's plea offer because the deal required him to admit the death-resulting charge. *See* Exh. 12 at 1 (noting that the offer required Shamo to "plead guilty *as charged*") (emphasis added). But even now Shamo cannot bring himself to say that he would accept a plea to the death-resulting count. That telling reluctance reveals Shamo's attempt to pocket the benefits of both the plea offer and the hung jury at trial. But he cannot have both. *See United States v. Day*, 969 F.2d 39, 46 n.9 (3d Cir. 1992)

("[C]ourts should be wary of this sort of claim because defendants will always want the best of both worlds: the chance at acquittal at trial, yet the chance to plead guilty if the trial fails."). Shamo's refusal to assert unequivocally that he would plead guilty to *all* the charges underscores his inability to establish that he would have accepted the plea offer.

**II. Counsel's Assistance at Trial**

Shamo's claim of ineffective assistance at trial relies on essentially the same premise as his plea-stage claim, and it is without merit for largely the same reasons. Shamo contends (Doc. 17 at 28, 33) that his trial counsel were tricked by the indictment's language and, failing to consult the statute of conviction, conducted the trial under the erroneous belief that Shamo would be acquitted if he could show that he shared leadership responsibilities with others. Then, after basing Shamo's defense on that premise, trial counsel were ambushed by the jury instructions and the government's closing argument, which correctly noted that Shamo could be convicted even if there were other principal leaders in the organization.

Shamo's argument is a distortion of the indictment's language and trial counsel's strategy. Trial counsel did not concede that Shamo was a principal leader and then urge the jury to acquit him because others were principal leaders too. *See Shamo*, 36 F.4th at 1075 (noting that, to obtain credibility, the defense conceded "almost all issues that could have been raised at trial" to "focus the jury's attention" on the argument that Shamo "was not a principal leader of the drug-trafficking operation"). Contrary to Shamo's argument, the defense aimed to show that Shamo was not a principal leader *at all*, that he could not have operated a complex drug organization, and that Shamo was the dupe of the organization's real leaders Crandall and Paz. *See, e.g.*, Crim. Doc. 398 at 2095 (defense counsel arguing that Shamo was not "a principal, administrator, organizer, [or] leader. He's a follower."); *id.* (arguing that Shamo was a "yes

man" who would "do anything" he was told to do by his partners). Thus, defense counsel did not characterize Shamo as one of several principal leaders, but argued that he was a "follower" and a "fool" who was set up by the true principal leaders to take the fall. *See id.* at 2095-96; *see also* Doc. 19-1 (Skordas Decl.) at 1-2; Tr. Vol. I at 154. Although that defense ultimately could not overcome the overwhelming evidence that Shamo was the enterprise's leader, *see Shamo*, 36 F.4th at 1074, Shamo's contention that the defense misunderstood the CCE statute's requirements is incorrect.

Shamo also contends that trial counsel blundered by focusing on the perceived unfairness in the government's relatively favorable treatment of Shamo's testifying co-conspirators, and, in particular, in suggesting that Crandall and Paz were permitted to avoid the CCE and death-results charges by pleading guilty and testifying against Shamo. But impeaching the testimony of allegedly more culpable accomplices by emphasizing their bias and assertedly lenient plea deals is a routine defense strategy that, in this case, the Tenth Circuit found to have been "partially effective." *Shamo*, 36 F.4th at 1075; *see also id.* (noting that the defense was able to obtain a hung jury on the "death-resulting count"). And because there was no viable alternative defense to the charge, it was not ineffective assistance for trial counsel to try to convince the jurors that Shamo's treatment was unfair, in the hope that this would motivate the jury to acquit him. *See* Tr. Vol. I at 155-56.

Even if counsel's performance at trial were deficient, Shamo cannot show prejudice because the evidence that he was the leader of the CCE was overwhelming. *See Shamo*, 36 F.4th at 1072-74 (summarizing the "compelling" evidence against Shamo). Indeed, Shamo effectively concedes that the allegedly ineffective strategy could not have prejudiced him because his petition expressly acknowledges that he had "no viable defense" to the leader enhancement.

Doc. 17 at 9; *see also id.* at 26 (arguing that the "[c]hance of conviction" on the leader enhancement "was 100%").

**III. Appellate Counsel's Assistance**

To prevail on a claim for ineffectiveness of appellate counsel, Shamo "must show both (1) constitutionally deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding - in this case the appeal - would have been different." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

"A claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, although it is difficult to show deficient performance under those circumstances because counsel 'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Cargle,* 317 F.3d at 1202 (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). In fact, "'a lawyer who throws in every arguable point . . . is likely to serve her client less effectively than one who concentrates solely on the strong arguments.'" *LaFevers v. Gibson*, 182 F.3d 705, 722 (10th Cir. 1999) (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989)). In sum, in analyzing an appellate ineffectiveness claim based on the failure to raise an issue on appeal, this Court looks to "the merits of the omitted issue" relative to the issues counsel chose to pursue. *Cargle*, 317 F.3d at 1202 (internal quotation marks and citations omitted).

Shamo's ineffective assistance claim fails because the prosecutorial misconduct claim that he claims appellate counsel should have raised has no merit. During closing arguments, the prosecutor told the jurors that determining Shamo's sentence was the trial judge's responsibility, not theirs: "[I]t's not my role, it's not your role. It's Judge Kimball's. He gets to choose the punishment, and he does it at sentencing." Crim Doc. 398 at 103. That statement was consistent with the jury instructions. *See* Crim Doc. 278 at 7 ("If you find the defendant guilty, it will be my duty to decide what the punishment will be. You should not discuss or consider the possible punishment in any way while deciding your verdict."); *see* Tenth Circuit Pattern Jury Instructions 1.20 at 34 (same). Trial counsel did not object to the prosecutor's statement, or to the instruction.

The prosecutor's argument, and the Tenth Circuit Pattern Jury Instruction on which it was based, are well supported in binding precedent. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) (noting that, outside the context of capital trials, the jury "should be admonished to reach its verdict without regard to what sentence should be imposed" because "[t]he jury's function is to find the facts" and "[t]he judge, by contrast, imposes sentence") (internal citation and quotation marks omitted); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (holding that "[t]he jury ha[s] no sentencing function and should reach its verdict without regard to what sentence might be imposed"); *United States v. Greer*, 620 F.2d 1383, 1384-85 (10th Cir. 1980) (same). It was not misconduct for the prosecutor to refer to a pattern jury instruction, to which no objection had been made, that accurately reflected a basic principle that is well established in Supreme Court and Tenth Circuit caselaw. Shamo's appellate counsel acted reasonably in not raising the meritless misconduct argument that Shamo now proposes.

Shamo contends (Doc. 17 at 31-32) that the prosecutor's argument was misleading as applied to his case because, under the mandatory sentencing provisions for principal leaders of a CCE, the judge does not "choose" the sentence. But the import of the prosecutor's argument, and the jury instruction that it tracked, was not the extent of judicial discretion but rather the division of responsibility between the jury and the judge. *See Shannon*, 512 U.S. at 579 ("The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury."). As the prosecutor's argument correctly explained, sentencing is the judge's responsibility, and the jury should reach its verdict "without regard to what sentence might be imposed." *Rogers*, 422 U.S. at 40. That is true regardless of the extent of the judge's sentencing discretion in a particular case. The prosecutor's argument was a correct statement of the law, was not misleading, did not constitute misconduct, and in any event did not prejudice Shamo's defense.

## IV. Indictment's Notice of the "Principal Leader" Element

Shamo contends (Doc. 17 at 20-24) that the indictment was constitutionally inadequate because it alleged that Shamo was "a principal . . . leader" of the enterprise while the statutory enhancement applies if he was either "the principal . . . leader' or if he was "one of several" such leaders. That contention has no merit. By using the indefinite article, the indictment made clear that multiple people in the criminal enterprise could qualify as a principal leader. The indictment therefore provided constitutionally sufficient notice that Shamo could be convicted if he was either the only principal leader or one of several principal leaders.

### A. The indictment properly alleged the "principal leader" element

The Constitution requires that the indictment must (1) "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend;"

and (2) enable him to assert a double jeopardy defense. *United States v. Rosendiz-Ponce*, 549 U.S. 102, 108 (2007). An indictment need not "recite the precise language of the statute" so long as it provides "fair notice of the charge." *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir. 1991). The test is not "whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Washington*, 653 F.3d 1251, 1259 (10th Cir. 2011); *see id.* (noting that an indictment is evaluated according to "practical rather than technical considerations"). When a defendant "fails to raise a timely challenge" to the indictment, the court "will liberally construe an indictment in favor of validity." *Id.* at 1259-60.

The indictment in this case satisfied these requirements. In pertinent part, Section 848(b)(1) provides for a mandatory term of life imprisonment if the defendant "is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders." 21 U.S.C. § 848(b)(1). The indictment plainly charged that Shamo was subject to that enhancement by alleging that he was "a principal administrator, organizer, supervisor and leader of the criminal enterprise . . . in violation of 21 U.S.C. § 848(b)(1)." Crim Doc. 136 at 94.

Shamo contends that the indictment was constitutionally inadequate because it alleged that he was "*a* principal . . . leader" *id.* (emphasis added), while the statutory enhancement applies if he was either "*the* principal . . . leader" or if he was "one of several" such leaders. In Shamo's view, the indictment's language effectively charged him with being *the only* principal leader, thereby leading Shamo to believe that he could be acquitted if he could show that anyone else, such as Crandall or Paz, was also a principal leader.

Shamo's interpretation is not a plausible reading of the indictment's language. Neither the allegation that Shamo was "a" principal leader nor anything else in the indictment states that Shamo was *the only* principal leader. In fact, the clear implication of the indictment's language is the opposite. *See United States v. Hagler*, 700 F.3d 1091, 1097 (7th Cir. 2012) (noting that "the indefinite article . . . generally implies the possibility of a larger number than just one"). By using the indefinite article, the indictment's allegation that Shamo was "a principal . . . leader" provided fair notice of the charge that Shamo was either "the" only principal leader or was one of multiple such leaders in his organization. *See United States v. Adair*, 38 F.4th 341, 351 (3d Cir. 2022) (holding that the indefinite article in a Sentencing Guidelines enhancement that applied where the defendant was "an organizer or leader" means that "multiple persons engaged in the same criminal activity could qualify as organizers or leaders"). In other words, charging Shamo with being "a" principal leader is synonymous with alleging that he was either "the" principal leader or "one of several" such leaders. At bottom, the statute allows conviction if Shamo was the only principal leader or if there were also others who played that role, and the indictment's allegation that Shamo was "a" principal leader covers both scenarios.

Shamo's contrary arguments lack merit. First, Shamo contends that the indictment's deviation from the exact wording of the statute is automatically a constitutional violation. But the law is clear that an indictment is sufficient if it contains "words of similar import to the element in question." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997); *see also Poole*, 929 F.2d at 1479 ("An indictment is not insufficient merely because it fails to recite the precise language of the statute" so long as it provides "fair notice of the charge."). Shamo fails to explain how the indictment's allegation that he was "a" principal leader is not "of similar import" to the statutory element that he be either "the" principal leader or one of several. *See*

*Hagler*, 700 F.3d at 1097 (7th Cir. 2012). Moreover, the indictment specifically cited 21 U.S.C. § 848(b)(1), which includes the "or one of several" language. *See United States v. Bolton*, 68 F.3d 396, 400 (10th Cir. 1995) (upholding an indictment in part because it specifically cited the statute at issue).

Shamo dismisses *Poole* as "an old gun case." Pet. 23. But Shamo does not point to any authority suggesting that the principle articulated in *Poole* – that an indictment need not recite the precise statutory language so long as it provides sufficient notice – is no longer good law or is limited to the "gun" context.

Shamo's reliance on *United States v. Staggs*, 881 F.2d 1476 (10th Cir. 1989), is likewise misplaced. The issue in *Staggs* was whether a CCE indictment, to provide constitutionally sufficient notice, must specifically identify the offenses constituting the underlying "continuing series of violations." The Tenth Circuit held that a CCE indictment that generally alleges a "continuing series of violations" consistent with the statutory language is sufficient, at least where the underlying violations are alleged in other counts in the same indictment. *Id.* at 1531. *Staggs* does not say, contra *Poole*, that a CCE indictment must always precisely track the statutory language, and it does not address the leadership role element at all. Nothing in *Staggs* suggests that a CCE indictment alleging that the defendant was "a principal. . . leader" is insufficient to charge the defendant with being either "the principal . . . leader" or "one of several" such leaders.

**B. Procedural Default**

Even if Shamo's defective indictment claim had merit, he would not be entitled to relief because he both waived and procedurally defaulted that claim by failing to raise it at trial or on direct appeal. Under Fed. R. Crim. P. 12, a defendant who fails to raise objections to an

indictment before trial waives those objections. *See United States v. Schneider*, 594 F.3d 1219, 1228 n.9 (10th Cir. 2010). And even if not waived, the claim may be raised in a collateral proceeding only if Shamo shows both "cause" excusing his double procedural default and "actual prejudice," or shows that a constitutional error has probably resulted in the conviction of one who is "actually innocent." *United States v. Frady*, 456 U.S. 152, 168 (1982); *Bousley v. United States*, 523 U.S. 614, 622-23 (1998). To establish "actual prejudice," Shamo must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

Shamo does not claim that he is innocent. Nor does he attempt to establish any cause that would excuse his procedural default. Although Shamo raises several claims of ineffective assistance of counsel, he does not appear to argue that counsel were ineffective in failing to challenge the sufficiency of the indictment. And even if he had, that claim would fail because, as explained above, Shamo's challenge to the indictment is not such a clearly meritorious claim that failing to raise it amounts to constitutionally deficient performance.

Nor could Shamo show actual prejudice. Even if it had been error to convict Shamo based on a finding that he was one of several principal leaders, there is no reasonable probability that the jury convicted Shamo on that basis because the evidence overwhelmingly showed that Shamo was *the only* principal leader. Indeed, although Shamo contends that the government's closing argument relied on the contention that Shamo was "one of several" principal leaders, the government's primary argument was that Shamo was the organization's sole principal leader. *See, e.g.* Crim Doc. 398 at 27 (arguing that "the law doesn't require that the defendant is the only principal administrator, organizer or leader, although I would submit that, based on the evidence,

he was"); *Id.* at 20 (arguing that "only Aaron Shamo" was "the leader"); *Id.* at 22 (explaining that only Shamo was charged with the CCE count because he was the only one who "organized, supervised, or managed five or more people"); *Id.* at 29-32 (arguing that it was "solely Mr. Shamo" who made the key business decisions in creating and administering the enterprise); *Id.* at 33 (arguing that "everyone [in the organization] was replaceable" except Shamo because "[h]e was the principal administrator, organizer and undisputed leader of this enterprise"); *Id.* at 57 (arguing that Shamo was "the leader, principal administrator, organizer, supervisor, [and] manager of all the others involved in this enterprise").

Those arguments were supported by overwhelming evidence. As the evidence established, Shamo was the principal leader of the organization. Shamo created the organization's business model of selling drugs on the dark web; he established and controlled the organization's supply of illegal drugs and precursor chemicals; he set up the organization's dark-web storefront and communications accounts; he recruited, supervised, and paid the organization's employees; he handled major customer relations problems; he made the key decisions; and he retained a majority of the profits. *See Shamo*, 36 F.4th at 1072-74 (summarizing the "compelling" evidence against Shamo). In the face of this evidence, Shamo cannot show that he was prejudiced by any alleged error in the indictment.

## CONCLUSION

Based on the above reasoning, Petitioner Aaron Michael Shamo's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [ECF No. 17] is DENIED and this action is DISMISSED.

DATED this 10th day of November 2026.

BY THE COURT:

DALE A. KIMBALL
United States District Judge